Ben YELLEN et al., Plaintiffs,

v.

Walter J. HICKEL, individually and as Secretary of the Interior, et al., Defendants.

Civ. No. 69–124.

United States District Court, S. D. California.

Nov. 23, 1971.

Arthur Brunwasser, San Francisco, Cal., for plaintiffs.

William R. Klein, Dept. of Justice, Lands and Natural Resources Div., Washington, D. C., and Harry D. Steward, U. S. Atty., San Diego, Cal., for defendants.

PARTIAL SUMMARY JUDGMENT

WILLIAM D. MURRAY, Senior District Judge.

Before the court is a motion for partial summary judgment. The suit was filed under 28 U.S.C.A. § 1361 to compel the Secretary of the Interior and lower level officials of the Department of the Interior to enforce the residency requirement of Section 5 of the Reclamation Act of June 17, 1902, 32 Stat.

389, 43 U.S.C.A., Section 431,[1] against lands located within the Imperial Irrigation District in California which receive water from the Boulder Canyon Project through the All American Canal. It is the government's contention that Section 5 has been superseded by Section 46 of the Omnibus Adjustment Act of May 25, 1926, 44 Stat. 649, 43 U.S.C.A., Section 423e,[2] and therefore the residency

1. Section 5 of the Reclamation Act of June 17, 1902, 32 Stat. 389, 43 U.S.C.A. § 431, provides:

"That the entryman upon lands to be irrigated by such works shall, in addition to compliance with the homestead laws, reclaim at least one-half of the total irrigable area of his entry for agricultural purposes, and before receiving patent for the lands covered by his entry shall pay to the Government the charges apportioned against such tract, as provided in section four. No right to the use of water for land in private ownership shall be sold for a tract exceeding one hundred and sixty acres to any one landowner, and no such sale shall be made to any landowner unless he be an actual bona fide resident on such land, or occupant thereof residing in the neighborhood of said land, and no such rights shall permanently attach until all payments therefor are made. The annual installments shall be paid to the receiver of the local land office of the district in which the land is situated, and a failure to make any two payments when due shall vender the entry subject to cancellation, with the forfeiture of all rights under this Act, as well as of any moneys already paid thereon. All moneys received from the above sources shall be paid into the reclamation fund. Registers and receivers shall be allowed the usual commissions on all moneys paid for lands entered under this Act."

2. Section 46 of the Omnibus Adjustment Act of 1926, 44 Stat. 649, 43 U.S.C.A. § 423(e), provides:

"No water shall be delivered upon the completion of any new project or new division of a project initiated after May 25, 1926, until a contract or contracts in form approved by the Secretary of the Interior shall have been made with an irrigation district or irrigation districts organized under State law providing for payment by the district or districts of the cost of constructing, operating, and maintaining the works during the time they are in control of the United States, such cost of constructing to be repaid within such terms of years as the Secretary may find to be necessary, in any event not more than forty years from the date of public notice hereinafter referred to, and the execution of said contract or contracts shall have been confirmed by a decree of a court of competent jurisdiction. Prior to or in connection with the settlement and development of each of these projects, the Secretary of the Interior is authorized in his discretion to enter into agreement with the proper authorities of the State or States wherein said projects or divisions are located whereby such State or States shall cooperate with the United States in promoting the settlement of the projects or divisions after completion and in the securing and selecting of settlers. Such contract or contracts with irrigation districts hereinbefore referred to shall further provide that all irrigable land held in private ownership by any one owner in excess of one hundred and sixty irrigable acres shall be appraised in a manner to be prescribed by the Secretary of the Interior and the sale prices thereof fixed by the Secretary on the basis of its actual bona fide value at the date of appraisal without reference to the proposed construction of the irrigation works; and that no such excess lands so held shall receive water from any project or division if the owners thereof shall refuse to execute valid recordable contracts for the sale of such lands under terms and conditions satisfactory to the Secretary of the Interior and at prices not to exceed those fixed by the Secretary of the Interior; and that until one-half the construction charges against said lands shall have been fully paid no sale of any such lands shall carry the right to receive water unless and until the purchase price involved in such sale is approved by the Secretary of the Interior and that upon proof of fraudulent representation as to the true consideration involved in such sales the Secretary of the Interior is authorized to cancel the water right attaching to the land involved in such fraudulent sales: * * * *Provided further*, That the operation and maintenance charges on account of lands in said projects and divisions shall be paid annually in advance not later than March 1. It shall be the duty of the Secretary of the Interior to give public notice when water is actually available, and the operation and maintenance charges payable to the United States for the first year after such public notice shall be transferred to and paid as a part of the construction payment."

requirement does not apply. For the following reasons this court finds that Section 5 is in force and the residency requirement is a prerequisite to receiving water from the Boulder Canyon Project.

The ruling on this motion is a determination made as a matter of law and does not depend upon any factual showing by the moving party beyond the allegations in the pleadings. There was a previous motion for summary judgment and that motion was denied without prejudice and therefore there is no bar to the present motion. Further the government raises the issue of standing in defense of this motion. A motion to dismiss for lack of standing to maintain a suit was denied at the same time as the previous motion for summary judgment, thus there is no need to rule on that question at this time.

The Boulder Canyon Project is authorized and governed by the Boulder Canyon Project Act of 1928, 45 Stat. 1057 et seq., 43 U.S.C.A. § 617 et seq. Under Sections 12 and 14 of that Act (45 Stat. 1064 and 45 Stat. 1065) the project is governed by the June 17, 1902 Act and "Act amendatory thereof and supplemental thereto". 43 U.S.C.A., Sections 617k, 617m. The question which concerns the court is whether Section 46 of the Omnibus Adjustment Act has so changed the original 1902 Act as to eliminate the residency requirement contained therein.

The government argues that under Section 46 of the 1926 Act the Secretary no longer is authorized to sell water directly to landowners on projects built thereafter. Instead, Section 46 requires the Secretary to contract with irrigation districts for delivery of water and repayment of the project and these contracts are required to impose certain conditions to which landowners must conform.[3] Since none of these conditions include a residency requirement it is ar-

gued that the effect of Section 46 is to eliminate any residency requirement from all reclamation projects governed thereby. This argument proves to be incorrect when viewed in the light of sound statutory construction and the background and purpose behind both Section 5 and Section 46.

The government points to no specific provision of the Omnibus Adjustment Act which repeals Section 5 of the 1902 Act. Nor do they contend that the 1926 Act entirely repealed the 1902 Act. It is a general rule of statutory construction that where there are two acts on the same subject, effect should be given to both if possible. United States v. Borden Co., 308 U.S. 188, 198, 60 S. Ct. 182, 84 L.Ed. 181. Further, repeals by implication are not favored and the intention of the legislature to repeal must be clear and manifest. Even when there is a positive repugnancy between the provisions of the new law and the old law, then the old law is repealed only *pro tanto* to the extent of the repugnancy. United States v. Borden, supra.

Statutory construction of Section 5 and Section 46 reveals no repugnancy whatever. Section 5 requires that there is no right to use water on tracts of any one owner of over 160 acres and no water shall be sold to anyone not occupying the land or residing in the neighborhood. Section 46 establishes a system whereby the Secretary no longer sells to individuals, but to irrigation districts instead, and provides for a situation not contemplated in the original Act where water would be supplied through the irrigation district to private landowners of more than 160 acres in addition to settlers on public lands opened up for entry under the original reclamation law. There is no inconsistency in applying the requirements of Section 5 at the same time with those of Section 46. The lat-

---

3. Section 46 provides that the following conditions which effect individual users be included in contracts with irrigation districts: (a) excess land over 160 acres shall be appraised and the sale price fixed by the Secretary; (b) no excess land shall receive water unless owners contract to sell the land at or below the contract price; (c) until one half the construction charges have been paid no water right passes with the sale until the sale is approved by the Secretary.

ter merely provides for sale of excess lands over 160 acres if the private owner wants reclamation project water. Section 5 requires that he be a resident to get water at all. A literal reading of both statutes then reveals no implied intent on the part of Congress that the earlier statute would be repealed by Section 46. Since both can stand by reasonable construction, that construction must be adopted. Wilmot v. Mudge, 103 U.S. 217, 221, 26 L.Ed. 536 (1881).

■ The plain language of the Omnibus Adjustment Act of 1926 does not repeal Section 5 of the 1902 Act, nor is any legislative intent to do so exhibited in the Act's background. The basic purpose of the 1926 Act is expressed in 43 U.S.C.A., Section 423f, 44 Stat. 650 (May 25, 1926) as follows:

"The purpose of sections 423–423g of this title is the rehabilitation of the several reclamation projects and the insuring of their future success by placing them upon a sound operative and business basis, and the Secretary of the Interior is directed to administer said sections to those ends."

The report on the House version of the bill H.R. 10429 prepared by the Committee on Irrigation and Reclamation refers to the reclamation policy of the government which was adopted as a result of the Act of June 7, 1902. The report points out that while the law had provided that the cost of projects be returned to the reclamation fund, settlers had been unable to do so in full and therefore it would be necessary to authorize the Secretary to credit the proj-

ects with losses sustained. Then the report continued:

"It is confidently believed that with the adjustment authorized herein the various projects will be put on a basis which will restore the morale and enthusiasm of the settlers and enable them to meet their payments promptly in the future. The settlers on these projects have endured great hardships and have struggled against the most adverse conditions in their effort to cooperate with the government in reclaiming these desert wastes, and are entitled to the proposed relief which has been urged upon the committee by the Representatives from the arid land States and the Secretary of the Interior for many years." See Adjustment of Water Charges, House Report No. 617 to accompany H.R. 10429, 69th Cong. 1st Session.

It is clear from the report that the purpose of the 1926 Act was to provide relief to settlers then residing on the land. There is no indication that the Act was intended to change the policy of the reclamation law.

The government has cited Section 1 of the Act of August 9, 1912, 37 Stat. 265, 43 U.S.C.A. § 541 as additional support to the contention that residence is no longer intended as a requirement for water rights under reclamation law.[4] That law requires that homestead entrymen submit proof of residency, reclamation and cultivation in order to obtain a patent while purchasers of water right certificates need only prove cultivation and reclamation of the land for a final

---

4. Section 1 of 37 Stat. 265, 43 U.S.C.A. 541, provides:

"Any homestead entryman under the Act of June 17, 1902, known as the reclamation Act, including entrymen on ceded Indian lands, may, at any time after having complied with the provisions of law applicable to such lands as to residence, reclamation and cultivation, submit proof of such residence, reclamation and cultivation, which proof, if found regular and satisfactory, shall entitle the entryman to a patent, and all purchasers of water-right certificates on reclamation projects shall be entitled to a final water-right certificate upon proof of the cultivation and reclamation of the land to which the certificate applies, to the extent required by the reclamation Act for homestead entrymen: *Provided*, That no such patent or final water-right certificate shall issue until after the payment of all sums due the United States on account of such land or water right at the time of the submission of proof entitling the homestead or desert-land entryman to such patent or the purchaser to such final water-right certificate."

certificate. This it is argued is evidence that residency has been eliminated as a requirement to receiving water. It is evident that Congress intended the Act to apply to purchasers of water rights for private lands as well as to entries of public lands. See House Committee on Irrigation of Arid Lands, Patent to Entrymen for Homesteads Upon Reclamation Projects, House Report No. 867 to accompany S. 5545, 62d Congress 2d Session, and I Department of Interior, Federal Reclamation Laws Annotated 15 (1958). However, there is no indication that the residency requirement of Section 5 was intentionally eliminated.

■■ In the West water and land are separate and ownership of land does not automatically give right to water use. This is reflected in the homestead laws where water rights are reserved from patents. See 43 U.S.C.A. § 661 as derived from 14 Stat. 253 and 16 Stat. 218. This explains why the patent and the water certificate were treated separately in Section 1 of the 1912 Act. The patent is a right to land—ownership in land. The certificate is evidence of a right to water subject to divestment for failure of application to beneficial use. See 43 U.S.C.A. § 372, 32 Stat. 390. However, the nature of the water right is not expressly delineated in reclamation law. The water right certificate describes the land upon which the water is to be used, the amount of water use allowed and aids in establishing priorities under state laws. Neither the reference to water rights in the 1902 Act, nor that in the 1912 Act make clear just what the user has, either before or after receiving the final water rights certificate. It is important to note, however, that reclamation laws are "designed to promote federal policies of permanent importance

and not merely to secure an investment interest." II Sax, Waters and Water Rights, 118 (R. Clark ed. 1967).

■■ That land and water are separate also helps explain why each is treated differently in Section 1 of the Act of 1912. The purpose of the Act of 1912 was to enable the settler to mortgage his property prior to final payment for the amount due for the water right. See Title for Homesteaders on Reclamation Projects, Senate Report No. 608 to accompany S. 5545, 62d Congress 2d Session. The water certificate was property right of sorts even though a defeasible one. It represented an incremental value of the price of the private land and as such was an asset which added to the mortgageable value of the land. See Sax, Selling Reclamation Water Rights: A Case Study in Federal Subsidy Policy, 64 Mich.L.Rev. 13, 1965, for a discussion of incremental values. The cultivation and reclamation requirements of Section 1 insure good faith on the part of the owner that the arid land would be cultivated and reclaimed. This purpose of the Act in no way changes the overriding original anti-monopolistic and anti-speculative purposes of the original reclamation law. (Discussion of this purpose to follow). Therefore, while cultivation and reclamation are required for a final water rights certificate, residency remained a requirement to receive water initially. See sample forms for water right applications in Department of Interior, Fourteenth Annual Report of the Reclamation Service 1914–1915, 268–276, which require affidavit of residence.

It should also be pointed out that on August 10, 1917, Congress saw fit to suspend the residence requirements during World War I. See 40 Stat. 273.[5] It

5. The Act of August 10, 1917, 40 Stat. 273, provides in part:
"Sec. 11 (Suspension of residence requirements.)—That the Secretary of the Interior is hereby authorized, in his discretion, to suspend during the continuance of this Act that provision of the Act known as the 'Reclamation Act' requiring residence upon lands in private ownership or within the neighborhood for securing water for the irrigation of the same, and he is authorized to permit the use of available water thereon upon such terms and conditions as he may deem proper. (40 Stat. 276.)
"Sec. 12 (Duration of suspension.)— That the provisions of this Act shall cease to be in effect when the national emergen-

would be strange indeed if Congress intended to eliminate the residence requirement for receiving water by the Act of 1912, that it deemed it necessary to suspend residency in 1917. It is much more plausible that there was and is a continuing intent on the part of Congress to keep alive the anti-speculative and anti-monopolistic purposes of the Act as expressed in the residency requirement.

The government's rationale in relying on Section 1 of the 1912 Act is somewhat obscure. Their primary argument rests on Section 46 of the 1926 Act. It is difficult to understand how the 1912 Act can shed light on a policy which they argue was not expressed until the 1926 Act of Congress.

 It is further argued that the elimination of the water right application by the Act of May 15, 1922, 42 Stat. 541, is an expression of intent to eliminate the residency requirement.[6] Where a legally formed irrigation district agreed to pay moneys owing the United States for construction and maintenance of the project, this statute dispensed with the requirement that individual water user file an application for water right. It is clear from the Department of Interior's Report, on S. 2118, dated May 23, 1921, to the Senate Committee on Irrigation and Reclamation of Arid Lands that the Senate bill, which later became the 1922 Act, dispensed with the

water right application in order to eliminate unnecessary amounts of work and possible complications. Since one function of the application was to establish a lien for the payment of water charges on each users land in favor of the United States, the elimination of the lien by the statute removed a basic reason for the application. Further, inasmuch as the new irrigation district is responsible to pay the United States for construction and maintenance, it would be collecting the payments from its members and controlling the distribution of water. A new applicant for water would be required to go through the district and to require an additional application to the Bureau of Reclamation could have made the process unnecessarily complex while only duplicating work which could be done by the district.

The application was used by the Bureau of Reclamation to enforce other provisions of the reclamation laws such as the residency requirement, (See Department of Interior, Land Ownership Survey of Federal Reclamation Projects 34, 35, 1946) but the 1922 Act fails to refer to residency. This failure does not lend support to any interpretation of the Act as an expression of intent to eliminate the residency requirement nor to change the national policy of the reclamation laws. There is no positive repugnancy between the 1922 Act and the residency requirement. The Secretary of Interior

---

cy resulting from the existing state of war shall have passed, the date of which shall be ascertained and proclaimed by the President; but the date when this Act shall cease to be in effect shall not be later than the beginning of the next fiscal year after the termination, as ascertained by the President, of the present war between the United States and Germany. (40 Stat. 276.)"

6. The Act of May 15, 1922, 42 Stat. 541, provides in part:
"That in carrying out the purposes of the Act of June 17, 1902 . . ., and Acts amendatory thereof and supplementary thereto, and known as and called the reclamation law, the Secretary of the Interior may enter into contract with any legally organized irrigation district whereby such irrigation district shall agree to

pay the moneys required to be paid to the United States, and in such event water-right applications on the part of landowners and entrymen, in the discretion of the Secretary of the Interior, may be dispensed with. . . ."
"Section 2. That patents and water-right certificates which shall hereafter be issued under the terms of the Act entitled 'An Act providing for patents on reclamation entries, and for other purposes,' . . . for lands lying within any irrigation district with which the United States shall have contracted, by which the irrigation district agrees to make the payment of all charges for the building of irrigation works and for operation and maintenance, shall not reserve to the United States a lien for the payment of such charges; . . . ."

is given authority to dispense with the application at his discretion, but remains charged with enforcing the policy of reclamation law which is still in force. Compliance with residency, which is an expression of national policy, should have been secured by other means.[7]

On April 19, 1916, the Department of Interior issued an opinion which undercut the policy of the reclamation law:

"The residency requirement of this section (Section 5, 1902 Act) in reference to private lands is fully complied with if, at the time water-right application is made, the applicant is a bona fide resident upon the land or within the neighborhood. After approval of the application further residence is not required of such applicant, and further proof may therefore be made under the Act of August 9, 1912 (37 Stat. 265), without the necessity of proving residency at the time proof is offered." (See I Federal Reclamation Laws Annotated, page 55–56).

The government cites this opinion along with subsequent Federal Regulations and expressions of policy by the Bureau of Reclamation as evidence of elimination of the residency requirement.[8] This evidence recognizes there is a residency requirement problem, but denies that residency is a continuing requirement as an expression of national policy. The Department cannot repeal an Act of Congress.

It could be argued that re-enactment of the statute, such as was the case in Section 14 of the Boulder Canyon Project which re-enacted the reclamation law, constitutes legislative acceptance of the earlier administrative interpretation.

It has been held that an administrative interpretation of a statute was binding on the court where it has been impliedly upheld by re-enactment of the statute. See Kieferdorf v. C. I. R., 9 Cir., 142 F. 2d 723. However, Congressional re-enactment of a statute, without expressed consideration or reference cannot give controlling weight to an originally erroneous administrative interpretation of the statute. United States v. Missouri Pacific Railroad Company, 278 U.S. 269, 280, 49 S.Ct. 133, 73 L.Ed. 322. The re-enactment of a specific clause or statute after administrative or judicial construction is merely one factor in the total effort to give fair meaning to the language thereof, and such circumstances must give way to plain language or basic purpose. Fleming v. Moberly Milk Products Co., 82 U.S.App.D.C. 16, 160 F.2d 259.

The Reclamation Act of 1902 was enacted after a long history of monopoly of and speculation in the arid lands in the west. This background resulted in a national policy of anti-monopoly and anti-speculation which found expression in reclamation law. It is this policy which provides possibly the strongest rationale for holding the residency requirement in force. From its very inception reclamation policy has been to make benefits therefrom available to the largest number of people. The 1902 Act contained a 160 acre limitation, required that users be bona fide residents, required that the reclamation water right be appurtenant to the land, and provided that rights to the water be limited by beneficial use. 32 Stat. 389, 390 (1902), 43 U.S.C.A., Sections 372, 383, 431 (1964). These devices were incorporated into the bill in order to prevent land

7. Section 46 of the Omnibus Adjustment Act provided that:
"Prior to or in connection with the settlement and development of each of these projects, the Secretary of the Interior is authorized in his discretion to enter into agreement with the proper authorities of the State or States wherein said projects or divisions are located whereby such State or States shall cooperate with the United States in promoting the settle-

ment of the projects or divisions after completion and in the securing and selecting of settlers." Again this provision was not intended to alter the effect of the reclamation law and the Secretary cannot exercise his discretion so as to subvert the purposes of the Act.

8. See Department of Interior Manual of the Bureau of Reclamation (1938 Edition) 373; Title 43, Code of Federal Regulations, Section 230.65.

monopolization and profiteering by large corporations to the detriment of the intended beneficiaries of the Act. See Taylor, The Excess Land Law-Execution of a Public Policy, 64 Yale L.J. 476, 484–86 (1955). The idea was to create a class of self-reliant family farmers. See Land Ownership Survey, supra, 61–73, 91.

National policy, as expressed in the reclamation laws, is to provide homes for people.[9] Homes are possible only where speculation and monopolization are not possible. The 160 acre limitation and the national policy which it reflects have been upheld by the Supreme Court in Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313. The residency requirement in Section 5 is a second expression of that national policy. Its repeal by implication would be contrary to the purpose for which Section 5 was enacted. Early in reclamation history events showed that "under the private projects where residence is not required, the developments have been very largely along the line of the creation of tenant farms." See Department of Interior, 11th Annual Report of the Reclamation Service 11, (1911–1912). Failure to enforce residency subverts the excess land limitation which Ivanhoe, supra, specifically upheld. Through the use of corporations, trusts and cotenancies flagrant violations of the purpose of this limitation are possible. Each of these farms may be used to by-pass the acreage limitation. The policy behind reclamation law to aid and encourage owner operated farms requires enforcement of the residency requirement to prevent these violations. See Sax, The Federal Reclamation Law in II Waters to Water Rights, supra, 217–224.

The fact that residency has not been required by the Department of Interior for over 55 years cannot influence the outcome of this decision.[10] Failing to apply the residency requirement is contrary to any reasonable interpretation of the reclamation law as a whole, and it is destructive of the clear purpose and intent of national reclamation policy. It is well settled that administrative practice cannot thwart the plain purpose of a valid law. United States v. City and County of San Francisco, 310 U.S. 16, 31–32, 60 S.Ct. 749, 84 L.Ed. 1050 (1940). Rather than indicate the validity of the administrative ruling, the lapse of time serves to dramatize the unavailability of relief in the past and points toward the need for increased access to the court in the future.

The Boulder Canyon Project Act, 45 Stat. 1065, 43 U.S.C.A. Section 617m, provides that the Act shall be deemed a supplement to reclamation law which shall govern the constructive operation and management of the works authorized. Inasmuch as Section 5 of the 1902 Act has been found in full force and effect, it must be applied to the Imperial Irrigation District as well as to all reclamation projects constructed pursuant to the Boulder Canyon Project Act. No right to the use of water for land in private ownership shall be sold to any landowner "unless he be an actual bona fide resident on such land, or occupant thereof residing in the neighborhood of said land, . . .". 43 U.S.C.A., Section 431.

That portion of the motion for summary judgment determining the applicability of Section 5 of the Act of 1902 is therefore granted, which in effect is merely an interlocutory adjudication of the applicable law.

9. See Kinney, A Treatise on the Law of Irrigation and Water Rights and the Arid Region Doctrine of Appropriation of Waters 1912, pp. 2238–2239. Kinney cites a portion of President Roosevelt's first message to Congress, delivered December 3, 1901, as a classic statement upon the subject. Roosevelt's idea was that as a result of reclamation and settlement of arid lands "our people as a whole will profit, for successful home-making is but another name for the upbuilding of the nation."

10. See 1916 Department of Interior Opinion, supra.

The posture of the case at this time is not such as the court can determine the other portions of the motion, and therefore reserves ruling thereon.